1  Rosanne L. Mah (State Bar No. 242628)
   Email: rmah@zlk.com
2  **LEVI & KORSINSKY, LLP**
   388 Market Street, Suite 1300
3  San Francisco, California 94111
   Telephone: (415) 373-1671
4  Facsimile: (415) 484-1294

5  Gregory M. Nespole (*pro hac vice* forthcoming)
   Email: gnespole@zlk.com
6  **LEVI & KORSINSKY, LLP**
   55 Broadway, 10th Floor
7  New York, New York 10006
   Telephone: (212) 363-7500
8  Facsimile: (212) 363-7171

9  *Attorneys for Plaintiff Ron Chenoy*

10

11                **UNITED STATES DISTRICT COURT**

12            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13  RON CHENOY, Derivatively on Behalf of LYFT,        Case No.
    INC.,
14                                                     **VERIFIED STOCKHOLDER
                                                       DERIVATIVE COMPLAINT**
15                     Plaintiff,

16  v.

17

18  JOHN ZIMMER, LOGAN GREEN, BRIAN
    ROBERTS, PRASHANT (SEAN)
19  AGGARWAL, DAVID LAWEE, HIROSHI
    MIKITANI, ANN MIURA-KO, MARY
20  AGNES (MAGGIE) WILDEROTTER,
    JONATHAN CHRISTODORO, BEN
21  HOROWITZ, and VALERIE JARRETT,

22                     Individual Defendants,

23  -and-

24

25  LYFT, INC., a Delaware corporation,

26

27                     Nominal Defendant.

28

Plaintiff Ron Chenoy ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## I.  NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Lyft, Inc. ("Lyft" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Lyft's reputation, goodwill, and standing in the business community and has exposed Lyft to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Lyft in the form of, among other things, millions of dollars in losses to the Company's market capitalization, resulting from exposure to liabilities and reputational damage.

2.      This action seeks to remedy wrongdoing committed by Lyft's directors and officers from March 28, 2019 through the present (the "Relevant Period").

3.      Lyft operates a peer-to-peer marketplace for on-demand ridesharing in the United States and Canada. The Company offers riders personalized and on-demand access to various transportation options. It provides a ridesharing marketplace, which enable drivers to provide their transportation services to riders. The Company also offers a network of shared bikes and scooters in various cities; Express Drive program, a flexible car rentals program that connects drivers who need access to a car with third-party rental car companies; and concierge for organizations to manage the transportation needs of their customers and employees.

4.      The Company initiated plans to go public in December 2018. When it filed a draft

registration statement with the SEC. On March 1, 2019, the Company filed its operative registration statement on Form S-1 with the SEC (the "Registration Statement") in connection with the planned initial public offering ("IPO"). On that same day, the Company filed with the SEC a Prospectus on Form 424B4 (the "Prospectus") in connection with the IPO. The Prospectus was included with the Registration Statement (together with all amendments these documents are referred to herein as the "Offering Documents").

5.     The Registration Statement was approved on March 28, 2019, and the Company's stock commenced trading publicly on the Nasdaq Global Select Market on March 29, 2019. As a result of the IPO, the Company sold over 32.5 million shares of stock priced at $72 per share and garnered approximately $2.34 billion in net proceeds.

6.     The Offering Documents outlined Lyft's culture, values, brand, commitment to safety, and dedication to social responsibility, particularly in relation to women. The Offering Documents explained Lyft's growth into other methods of transportation such as its recently-acquired bike sharing program. Further, the Offering Documents provided an overstated market share and highlighted certain revenue growth attainments. The Offering Documents described Lyft as "driver-centric" and listed key benefits that Lyft gave its drivers to provide an overall positive driver experience. Lastly, the Offering Documents detailed the risks facing the Company, including illegal, improper, or otherwise inappropriate activity of the Company's proprietary network that could be detrimental Lyft's business. However, these outlined risks did not include a huge number of issues with the Company's rideshare services known to Lyft at that time.

7.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects in its Offering Documents, and failing to timely correct those statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, inter alia, that: (1) passengers were physically assaulted, sexually harassed, and/or raped by Lyft drivers and reported complaints with the Company about their experiences

prior to the IPO; (2) it was highly probable that the Company would suffer reputational damage and/or legal liability due to the rampant and increasing amount of sexual assaults committed by Lyft drivers; (3) the braking system on Lyft's electronic bikes was defective and riders sustained injuries such as scrapes, bruising, broken bones, and damaged limbs; (4) riders who were injured as a result of defects in the braking system in Lyft's electric bikes lodged complaints with the Company about their accidents prior to the IPO; (5) safety issues related to the Company's electric bike fleet stifled Lyft's expansion, diversification, and transformation into a multimodal transportation network; (6) labor disputes with Lyft's drivers, resulting from the Company's policy changes leading up to the IPO, threatened to disrupt Lyft's workforce and significantly impact its business; (7) the Company had suffered a colossal first quarter net loss totaling over $1.1 billion, more than double the net loss the Company recognized the fiscal year prior; (8) the Company planned to abandon key revenue growth metrics that the Company touted in its Offering Documents as important measurements of Lyft's financial performance and growth; (9) the Company's market share was overstated; and (10) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

8.     Eventually, even though it was internally known beforehand, the Company disclosed weak performance for the first fiscal quarter of 2019. However, the Individual Defendants failed to issue statements correcting the misstatements and omissions that were contained in the Offering Documents. Further, the Individual Defendants repeated many of the false and misleading statements contained in the Offering Documents in subsequent public statements distributed after the IPO, including in the Company's quarterly report for the fiscal quarter ended March 31, 2019 (the "1Q19 10-Q") and in the related earnings press release and conference call.

9.     From Lyft's IPO until May 8, 2019 when the above events were unfolding, the price per share of the Company's common stock dropped over 26.5%, or $19.09, from its IPO price of $72.00 per share to $52.91 per share.

10.     After the IPO, the Individual Defendants failed to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

12.     As detailed herein, and as alleged in the ongoing federal securities class action in the Northern District of California styled *In Re Lyft Technologies Inc. Securities Litigation*, Case No. 19-cv-02690-HSG, (the "Federal Securities Class Action"), and a securities class action lawsuit pending in the Superior Court of the State of California, County of San Francisco (together "the Securities Class Actions"),  Lyft's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

13.     Specifically, on September 8, 2020, the District Court in the Federal Securities Class Action issued an order granting in part and denying in part defendants' motion to dismiss. *See* Dkt. No. 78.  The District Court found that the complaint adequately at the motion to dismiss stage that the Registration Statement's omission of any mention of potential liability from sexual assaults perpetrated by drivers against riders rendered the Company's statements touting safety materially misleading. Moreover, the complaint adequately alleged that the Registration Statement failed to warn of reputational risk stemming from the sexual assault allegations and litigation and that such reputational risk had already materialized by the time of the Company's IPO. The complaint also sufficiently alleged that the bikeshare program's risk factors were insufficient for the purposes of the motion to dismiss because many of the problems and safety issues arising from the bikes had already occurred there constituting present realities not contingencies.

## II.     <u>JURISDICTION AND VENUE</u>

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under question under Section 11(f) of the Securities Act,

15 U.S.C. § 77k (f)(1), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have such jurisdiction.

17.     This Court has personal jurisdiction nominal defendant Lyft, because it is a corporation conducting substantial business in this District. This Court has personal jurisdiction over each of the Individual Defendants because he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Lyft is incorporated in this District.

### III.     THE PARTIES

**Plaintiff**

19.     Plaintiff Ron Chenoy is and has continuously been a stockholder of Lyft during the wrongdoing complained of herein.

**Nominal Defendant**

20.     Defendant Lyft is a Delaware corporation with its principal executive offices located at 185 Berry Street, Suite 5000, San Francisco, California 94107. The Company's shares trade under the ticker symbol "LYFT."

**Individual Defendants**

21.     Defendant John Zimmer ("Zimmer") co-founded Lyft in 2007 and has served as Lyft's President since March 2013 and as Vice Chairman since January 2019. He has served as a Company director since June 2010. In 2019, Defendant Zimmer received $441,346 in salary and $1,571,104 in all other compensation for a total compensation of $2,012,450.

22.     Defendant Logan Green ("Green") co-founded Lyft in 2007 and has served as Lyft's CEO and as a Company director since 2007. In 2019, Defendant Green received $441,346 in salary and $360,218 in all other compensation for a total compensation of $801,564.

23.     Defendant Brian Roberts ("Roberts") has been the Company's Chief Financial Officer ("CFO") since November 2014. In 2019, Defendant Roberts received $441,346 in salary, $9,123,624 in stock awards, and $2,664 in all other compensation for a total compensation of $9,567,634.

24.     Defendant Prashant (Sean) Aggarwal ("Aggarwal") has served as the Company's Chairman of the Board since January 2019 and as a Company director since February 2016. He also serves as a member of the Audit Committee and Compensation Committee. In 2019, Defendant Aggarwal received $82,581 in fees earned or cash paid and $259,979 in stock awards for a total compensation of $342,560.

25.     Defendant David Lawee ("Lawee") has served as a Company director since November 2017. He also serves as the Chairperson of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. In 2019, Defendant Lawee received $49,472 in fees earned or cash paid and $259,979 in stock awards for a total compensation of $309,451.

26.     Defendant Hiroshi Mikitani ("Mikitani") served as a Company director from March 2015 until he resigned on August 31, 2020. In 2019, Defendant Mikitani received $30,444 in fees earned or cash paid and $259,979 in stock awards for a total compensation of $290,423.

27.     Defendant Ann Miura-Ko ("Miura-Ko") has served as a Company director since June 2016, and previously served as a Company director from June 2010 until May 2013. She also serves as the Chairperson of the Nominating and Corporate Governance Committee. In 2019, Defendant Miura-Ko received $38,817 in fees earned or cash paid.

28.     Defendant Mary Agnes (Maggie) Wilderotter ("Wilderotter") has served as a Company director since May 2018. She also serves as the Chairperson of the Audit Committee. In 2019, Defendant Wilderotter received $49,472 in fees earned or cash paid and $259,979 in stock awards for a total compensation of $309,451.

29.     Defendant Jonathan Christodoro ("Christodoro") served as a Company director from May 2015 until he resigned in March 2019. He also served as a member of the Compensation

Committee.

30.    Defendant Ben Horowitz ("Horowitz") served as a Company director from June 2016 until June 2020. In 2019, Defendant Horowitz received $36,914 in fees earned or cash paid and $259,979 in stock awards for a total compensation of $296,893.

31.    Defendant Valerie Jarrett ("Jarrett") has served as a Company director since July 2017. She also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. In 2019, Defendant Jarrett received $41,861 in fees earned or cash paid and $259,979 in stock awards for a total compensation of $301,840.

32.    Collectively, Individuals Zimmer, Green, Roberts, Aggarwal, Lawee, Mikitani, Miura-Ko, Wilderotter, Christodoro, Horowitz and Jarrett are referred to herein as the "Individual Defendants."

33.    Collectively, Individuals Green, Aggarwal, Lawee, Miura-Ko, Wilderotter, and Jarrett are referred to herein as the "Director Defendants".

34.    Collectively, Defendants Wilderotter, Aggarwal and Jarret are referred to herein as the "Audit Committee Defendants."

35.    The Individual Defendants, because of their positions with Lyft, possessed the power and authority to control the contents of Lyft's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.    Background

36.     Lyft is a San Francisco, California-based ridesharing company originally founded in 2007. After Uber Technologies, Inc. ("Uber"), it is the second fastest growing ridesharing company in the United States and Canada. The Company, via its mobile app, matches passengers with drivers of vehicles for hire that, unlike taxicabs, cannot legally be hailed from the street. When choosing between Uber and Lyft, many riders go with the cheaper or quicker options. Others are swayed by perceptions about safety. The primary services provided by the two Companies are essentially the same. Thus, reputation and branding is a key factor to gain a competitive edge as the companies compete with one another in this business. Lyft has tried to differentiate itself from Uber by massively expanding its bike-sharing business, an industry in which Uber has not expanded as strongly.

37.     Lyft's business includes single-use ride fees or subscription fees paid by bike riders to access the Company's fleet of shared bikes, which became part of its business following its purchase of Bikeshare Holdings LLC ("Motivate") in 2018. Motivate had expanded its bikeshare system through exclusive contracts in many of the major cities in the United States, including New York City's "Citi Bike" and also provided electric bikes in 2018.

38.     Lyft laid out $100 million in capital in connection with the purchase of Motivate's bike-sharing system for the New York metro area in the next five years and assumed certain pre-existing contractual obligations to increase the bike fleets in other locations. The Company has continually marketed the acquisition of Motivate as an essential part of its early growth. In a blog post announcing the acquisition, the Company said "[t]ogether Lyft and Motivate will revolutionize urban transportation and put bike-share systems across the country on a path toward growth and innovation." Lyft also committed to "invest[ing] to establish bike offerings in our major markets and pursue growth and innovation in the markets where Motivate currently operates."

### B.    Lawsuits Reveal Many Incidences of Sexual Assault before the Company

**Went Public**

39.     Prior to its initial public offering, Lyft experienced major problems with sexual assaults committed by its drivers and its inability to implement appropriate measures to prevent and respond to these instances. Following the IPO, extensive news coverage and lawsuits exposed Lyft's sexual assault problem with its drivers. Numerous lawsuits, including class actions, allege the Company failed to protect its customers from harms, and, more importantly, failed to adequately respond to and remedy past instances of assault. Instead of taking timely action by introducing easily implemented and available procedures, training, and policies to deal with these drivers, the Individual Defendants failed to respond.

40.     The reason for this inaction was partly because the Company, with various pending litigations, was concerned that taking affirmative disciplinary would result in Lyft's drivers being classified as "employees" instead of "independent contractors." If these drivers were classified as employees, the Company was concerned with the associated legal obligations arising from such a classification including exposing the Company to greater potential liability and compliance costs. Further, at the time of the IPO, Lyft's application and communication methods lacked any safety features that might allow a passenger to immediately report a sexual assault instance or other misconduct committed by a driver. Lyft's background check policy was also deficient. Indeed, the policy failed to include a background check of prospective drivers spanning the prior five years.

41.     While the exact numbers of incidences of sexual assaults cannot be specified because Lyft has not yet released the actual numbers, the various lawsuits filed provide examples of the many incidents which occurred prior to Lyft's IPO as well as customers' experiences with Lyft's procedures and oversight in response to these incidents.  Notably and in stark contrast, as Uber has made public information concerning the number of assaults reportedly committed by its drivers.

42.     Both prior to and during the Relevant Period, hundreds of incidents were reported to Lyft and Lyft was sued by women in various states. Some of these actions were consolidated and relate to events dating as far as 2014. The lawsuits allege that Lyft failed to take active

measures to ensure that female passengers were safe. And when women reported the incidents to Lyft, the Company did little or nothing to remedy the situation.

43.     The examples below illustrate the hundreds of experiences of sexual assault that women suffered because of Lyft's inaction. These instances would have become known if Lyft did what Uber did and publicly reported them. In one lawsuit related to a series of sexual assaults which occurred as early as 2015 and was filed by 19 Plaintiffs (many of whom do not wish to be named), one woman detailed an incident where she was raped by a Lyft driver and that afterward "they [Lyft] didn't even really say sorry at all. They just said, 'OK, well we're going to send you your money back.'" She explained Lyft's response after the incident: "I didn't even get an email. It was crazy. They kind of just pushed it under the rug, and were like, 'whatever.'"[1]

44.     Another survivor, who wished to remain anonymous, said she had fallen asleep in the back of a Lyft car and woke to the driver molesting her from the front seat. Fearing for her life and thinking of her 7-year-old son, she fought back. The driver pulled over on a dark street and they tumbled out of the car. Her arm was caught in the vehicle as he eventually drove away, dragging her body on the pavement. She broke free and crawled to a nearby house where a woman answered the door and helped her.[2]

45.     After reporting the incident to Lyft, she never heard whether the driver was deactivated. This kept her up at night as the driver knew where she lived.  The woman noted, "If there was a camera in the car that night, I can almost guarantee that nothing would have happened," and "I think Lyft has done a super, super great job hiding all of this."

46.     Another plaintiff in one of these many lawsuits said that she was among many who deleted the Uber app in 2017 because of reports of internal sexual harassment at the company. Later that year when she took a Lyft after a night out with friends, she was kidnapped at gunpoint, driven across state lines, and gang-raped by the driver and at least two other men. "I thought I was

---

[1] *Jane Roe 1 et al v. Lyft, Inc. et al.* (No: CGC-19-581262) Ca. Sup. Ct (filed 12/04/2019).
[2] *Id.*

being a good feminist that night by choosing Lyft, Uber wasn't on my phone at the time. . . But look where it got me, look where my good and safe decision landed me."[3]

47.    In these and many similar lawsuits, hundreds of female victims have alleged that Lyft could have easily done more to protect them by requiring in-car video monitoring and conducting fingerprint-based background checks. They alleged that Lyft did not adequately investigate customer complaints of sexually inappropriate behavior.

48.    Only many years after the incident first began in 2015, and in response to these lawsuits, a Lyft spokesperson Ashley Adams announced that Lyft had implemented new safety features  such as "15 new safety features…including in-app emergency assistance, continuous criminal background monitoring of drivers and mandatory feedback for rides rated less than four stars."[4] Adams further said, "We know this work is never done, which is why we continue to invest in new products, policies and features to make Lyft an even safer platform for our community." In fact, these measures may have prevented many of the sexual assaults and the technology was available and would have been easy to implement by Lyft many years earlier, and throughout the Relevant Period.[5]

49.    The multitude of reports of sexual assault incidences, and Lyft's response, as outlined above, called into question the image of corporate responsibility that Lyft promotes against its larger rival, Uber, which has also been plagued by sexual assault claims against its own drivers. When Uber's former CEO Travis Kalanick resigned after accusations of rampant sexual harassment inside the company in 2017, defendant Zimmer told the New York Times, "There's nothing to celebrate in this situation." But, he added, "It does shine a light on the importance of values and ethics."[6] Mr. Zimmer's public comment was conflicting in that he preached that values

---

[3] *Alison Turkos v. Lyft, Inc. et al* (No. CGC-19-579280) (Ca. Super. Ct.) (Filed:  09/17/2019).

[4] https://apnews.com/article/4634719e61021bf6b9995075c39c36e6 (last accessed October 20, 2020).

[5] *Id.*

[6] *Id.*

and ethics are important when responding to these sexual harassment incidences at Lyft's main competitor, Uber, yet Lyft's history of inadequate responses did not suggest it had an exemplary record on sexual harassment.

50.     Indeed, Uber's actions taken in response to these incidences stand in stark contrast to Lyft. Following the announcement of its issuing of a safety report and that it would not bind sexual assault victims to an arbitration clause for related claims in early May 2018, Uber also issued a "safety review" for 2017 and 2018 on December 5, 2019. This review showed that Uber had reports of "5,981 allegations of serious sexual assault in the U.S." and that approximately 3,349 of those instances were reports by passengers against drivers.[7]

51.     Even though Lyft boasts that it is a "safe, progressive alternative"[8] to Uber, Lyft has not published any report of sexual assault incidences despite announcing that it would issue a safety report on May 15, 2018, more than two years ago.  Given that 75% of Lyft drivers also drive for Uber, it is likely that Lyft's sexual assault records are similar, or worse, than the numbers of reports released by Uber.

52.     Lyft runs promotions at bars and with beer companies offering free or discounted drinks to customers who show the Lyft app and say they plan to take a Lyft ride home. Some of Lyft's promotions advertised, "Drink up. We're driving," and promised, "We partnered with select local bars to get you home safe." These marketing actions led women to believe Lyft was a safe alternative to Uber during the Relevant Period.[9]

53.     The documented lack of Lyft's action and delay in accurately reporting sexual assaults questions whether Lyft's assertion during the Relevant Period that it was a "safe alternative" was true and whether the Company's leadership was additionally issuing false statements. The record reflects that in its rush to compete with Uber, the Company placed profits

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

before safety. Organizations that work with sexual assault victims have applauded Uber's efforts to tackle safety issues after the company released its long-awaited safety report. However, Lyft has largely remained silent on its own problems with assault, noting that it, too, will release a safety transparency report but has not announced when such a report would be released.[10]

### C. Lyft's New Bike Fleet was Plagued by Safety Defect Before the Company Went Public

54.     Before Lyft bought Motivate, Motivate's bikes experienced numerous problems regarding maintenance of its fleet of electronic bikes. On September 26, 2018, StreetsBlog published an article titled "It's Not Your Imagination, Something is Seriously Wrong With Citi Bike Right Now," revealing that "[i]n the last two weeks, 21 percent of its [bikes] have simply disappeared" and that "there were only 7,166 Citi Bikes in service on Tuesday, Sept. 25, down from 9,112 bikes two weeks earlier." The article further stated that Citi Bike was "far and away the world's worst-maintained [bike-share] system" and that "[n]o other comparable bike-share system comes even close to having 41 percent of its fleet simply unavailable."[11]

55.     Further, Motivate admitted that many of its bikes were in need of repair, saying "Keeping the bike fleet in a state of good repair is a key priority for Citi Bike, and right now we have a backlog of bikes that are due for maintenance and repairs" and also that "[w]e are putting extra resources toward getting these bikes back out on the street and expect fleet levels will improve soon."[12]

56.     On February 28, 2019, Medium published an article, written by Caroline Samponaro, Lyft's Head of Bike, Scooter, & Pedestrian Policy, in which Samponaro said:

> To date, we've only deployed electric bikes on a relatively small scale in select cities. That's about to change, because of the results we've seen. The early data hints at the enormous potential:

[10] *Id.*

[11] https://nyc.streetsblog.org/2018/09/28/de-blasio-seeks-no-sanctions-for-citi-bike-contract-violation/

(Last visited October 21, 2020).

[12] *Id.*

So far, we've piloted electric bikes in our bikeshare networks in the Bay Area, New York City and Washington DC area. Altogether, riders have pedaled more than 912,000 trips on electric bikes since our pilots began.

*** 

You know Lyft as a rideshare company, so it might be surprising to hear this: we truly believe electric bikes will become a real alternative to rides in cars, and we're excited about that. Bikeshare is a natural extension of Lyft's vision to improve transportation access, sustainability and affordability. We want the members of our community to get where they are going quickly and easily, and it's very clear that electric bikes are the next great way to do that.

57.     Members of Motivate's management team migrated to Lyft when it bought Motivate in 2018. Therefore, Lyft's management was aware of the extensive problems plaguing Motivate's electronic bikes. Further, under the agreements Motivate entered into with the various cities where their bikes were located, Motivate was required to maintain records of each complaint and accident. The Individual Defendants, however, failed to timely disclose any of the problems they learned concerning the newly purchased electronic, as outlined below.

58.     One major such problem, which was well known to Individual Defendants prior to the IPO, was that Motivate's electric bikes had a defect in their braking system. Specifically, the brakes would engage more abruptly than they should have, which, especially when going down-hill, would cause riders to be thrown over the bike's handlebars. This defect occurred because Lyft's electric bikes did not have the required "power modulator" that Shimano, the brake manufacturer, said was necessary for the brakes to adequately operate.

59.     In its dealer and user manual, Shimano described and fully disclosed to Lyft that **"[i]f the hub is not equipped with the power modulator, the braking force may be excessively applied."** (Emphasis Added). Further, in a statement, Shimano noted that Lyft was responsible for these problems in its bike fleet:

Shimano provides specification requirements for bicycle manufacturers to refer to when designing bicycles. When designed and assembled to these specifications the brakes perform to global standards. With regards to this specific case, based on the information we have, this is not a Shimano brake issue as the specification requires the use of a power modulator for this brake. It appears this specification was not followed by manufacturers of some of the bicycles in question.

60.     One of the main causes of the above-mentioned braking problems was that bike

mechanics and technicians in Lyft's network were not trained to work with the electronic braking systems or electric bike brakes ("e-brakes") in general. As reports of crashes came in, mechanics were told to run through a series of basic maintenance tests, including torquing and re-greasing the brakes. These attempts to fix the problems were largely ineffective because the bikes were not fitted with the power modulator per Shimano specifications and warnings above.  In the transition, there was a fundamental lack of knowledge about these mechanical issues that were going on and the need to fit bikes with power modulators. Thus, mechanics were getting bikes for repair before most mechanics knew how to work on the problems facing electric bikes, and even then, it is questionable if those repair techniques could address this fundamental defect, which would explain why the whole fleet eventually needed to be pulled out of the system and checked. All the while, the rush to get the bike fleet up and running, and position Lyft as a leader in this market, may have meant that the Company was trying to make it out first rather than taking the time to properly address these safety issues.[13]

61.     Holly Brinkman, the head of marketing for GenZe, a Bay Area company that manufactured Motivate's first line of electronic bikes for Ford GoBike said, in relation to the recall of many of the bike's in Lyft's fleet, that "[w]hen Lyft acquired Motivate, it moved GenZe's bikes to San Jose and replaced them with modified bikes taken from Motivate's existing fleet. Brinkman further explained that, "[i]n terms of expansion, it was more affordable to electrify [Lyft's] existing bikes rather than acquire new electric bikes" and that "[Lyft] essentially did a makeshift electric bike with their existing frame and model."[14]

62.     As a result of the defects described above, prior to the IPO, riders of Lyft's electric bikes sustained injuries and lodged complaints about the defects in the braking system. Some examples of those instances are outlined below.

63.     On February 19, 2019, John Bacon, riding a pedal-assist Lyft Bike in Midtown,

---

[13] https://www.bicycling.com/news/a27287868/lyft-electric-bike-share-recall/ (last accessed October 21, 2020).

[14] *Id.*

Manhattan, New York flew over the handlebars after tapping the brake. While he didn't break any bones, he can't fully bend his right knee because of the crash that occurred.[15]

64. On March 3, 2019, Julie Li, a daily bike commuter for more than 15 years, broke her left wrist after flying off a hard-stopping electric Citi Bike in Park Slope, Brooklyn, New York.[16]

65. On March 16, 2019, Felipe Ventura was thrown over the handlebars of the Citi Bike electric bike he was riding after applying the brakes to prevent a collision with a pedestrian. Due to the incident, Ventura broke his left and right elbows.[17]

66. On March 17, 2019, Bill Somers flew over the handlebars of a Citi Bike and broke his hip after tapping the front brake on a Citi Bike on the Upper West Side of Manhattan, New York. [18]

**D.** **Drivers' Strike Prior to the IPO, Disrupting Lyft's Labor Force**

67. In order to increase profits ahead of the IPO, Lyft began charging "surge pricing" more often than in the past and did not pass on an equitable portion of these profits to its drivers. As a result, drivers were receiving less pay and, understandably, they felt less motivated to drive for Lyft.

68. A series of general strikes was coordinated on March 25, 2019 by Lyft drivers in Los Angeles, San Diego and San Francisco, California, United States and led by rideshare advocate group Rideshare Drivers United. The strikes aimed to protest low wages, long hours, working conditions, and lack of benefits. Lyft drivers were also unhappy about the Company's classification of them as independent contractors. By classifying drivers as independent contractors, rather than employees, Lyft is not required to pay minimum wage, pay overtime

---

[15] Id.

[16] Id.

[17] Id.

[18] Id.

1   compensation, offer paid breaks, or even reimburse drivers for the costs of driving.

2   69.   While Lyft drivers were demonstrating their dissatisfaction with working

3   conditions with the Company, the Individual Defendants omitted from Lyft's Offering Documents

4   that labor disruption was a measurable outcome which affected the Company's business at that

5   time and would continue to do so in the future.

6   **E.    Lyft's Initial Public Offering and a Comparison with Uber**

7   70.   Prior to Lyft's IPO, the Individual Defendants began implementing steps to take

8   the Company public which included preparation and filing of the Offering Documents. On March

9   18, 2019, the Company filed an amendment to the Registration Statement on Form S-1/A with the

10   SEC. This document said that that 30,770,000 shares of Class A common stock would be registered

11   in the IPO at a proposed maximum offering price per share of $68.00. A second amendment was

12   filed with the SEC on March 27, 2019. The second amendment said that 30,770,000 shares of

13   Class A common stock would be registered in the IPO at a proposed maximum offering price per

14   share of $72.00. The Registration Statement was approved and came into effect, on March 28,

15   2019.

16   71.   On March 29, 2019, the Company filed the Prospectus with the SEC and the

17   Company's stock began trading publicly that day. Subsequently, the Company sold 32.5 million

18   shares of Class A common stock at $72 per share, including additional shares sold through options

19   exercised by the underwriters to the IPO. Through the IPO, Lyft received aggregate net proceeds

20   of approximately $2.34 billion after deducting underwriter costs and expenses.

21   72.   On May 9, 2019, just after Lyft's IPO, Uber also went public after the filing of its

22   offering documents.

23   73.   Unlike Lyft, Uber's offering documents, included a "Risk Factors" section which

24   included specific warning for investors related to Uber drivers committing history of sexual

25   assault:

26   Maintaining and enhancing our brand and reputation is critical to our business
prospects. We have previously received significant media coverage and negative
27   publicity, particularly in 2017, regarding our brand and reputation, and failure to
rehabilitate our brand and reputation will cause our business to suffer.

28

Maintaining and enhancing our brand and reputation is critical to our ability to attract new employees and platform users, to preserve and deepen the engagement of our existing employees and platform users, and to mitigate legislative or regulatory scrutiny, litigation, government investigations, and adverse platform user sentiment.

We have previously received a high degree of negative media coverage around the world, which has adversely affected our brand and reputation and fueled distrust of our company. In 2017, the #DeleteUber campaign prompted hundreds of thousands of consumers to stop using our platform within days. Subsequently, our reputation was further harmed when an employee published a blog post alleging, among other things, that we had a toxic culture and that certain sexual harassment and discriminatory practices occurred in our workplace. Shortly thereafter, we had a number of highly publicized events and allegations, including investigations related to a software tool allegedly designed to evade and deceive authorities, a high-profile lawsuit filed against us by Waymo, and our disclosure of a data security breach. These events and the public response to such events, as well as other negative publicity we have faced in recent years, have adversely affected our brand and reputation, which makes it difficult for us to attract and retain platform users, reduces confidence in and use of our products and offerings, invites legislative and regulatory scrutiny, and results in litigation and governmental investigations. Concurrently with and after these events, our competitors raised additional capital, increased their investments in certain markets, and improved their category positions and market shares, and may continue to do so.

In 2019, we plan to release a transparency report, which will provide the public with data related to reports of sexual assaults and other safety incidents claimed to have occurred on our platform in the United States. The public responses to this transparency report or similar public reporting of safety incidents claimed to have occurred on our platform, which may include disclosure of reports provided to regulators, may result in negative media coverage and increased regulatory scrutiny and could adversely affect our reputation with platform users. Further unfavorable media coverage and negative publicity could adversely impact our financial results and future prospects. As our platform continues to scale and becomes increasingly interconnected, resulting in increased media coverage and public awareness of our brand, future damage to our brand and reputation could have an amplified effect on our various platform offerings. Additionally, following the closing of our acquisition of Careem, the Careem brand and its apps will continue to operate in parallel with our brand and apps, and any damage or reputational harm to the Careem brand could adversely impact our brand and reputation.

\*\*\*

While we have taken significant steps to rehabilitate our brand and reputation, the successful rehabilitation of our brand will depend largely on maintaining a good reputation, minimizing the number of safety incidents, improving our culture and workplace practices, improving our compliance programs, maintaining a high quality of service and ethical behavior, and continuing our marketing and public relations efforts. Our brand promotion, reputation building, and media strategies have involved significant costs and may not be successful. We anticipate that other competitors and potential competitors will expand their offerings, which will make maintaining and enhancing our reputation and brand increasingly more difficult and expensive. If we fail to successfully rehabilitate our brand in the current or future

19

competitive environment or if events similar to those that occurred in 2017 occur in the future, our brand and reputation would be further damaged and our business may suffer.

74.     The reason these disclosures were provided in connection with Uber's IPO is that Uber recognized its disclosure obligations under SEC Regulation S-K, which requires certain affirmative disclosures for public companies with respect to their finances and operations. Specifically, Item 303(a)(3) of Regulation S-K requires public companies to:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

75.     Item 105 of Regulation S-K also requires that public companies to include in the "Risk Factors" section of the Offering Documents that serves as "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."

76.     Accordingly, the Individual Defendants had a duty pursuant to Regulation S-K to disclose information known to them at the time of filing the Offering Documents, namely: (1) passengers were physically assaulted, sexually harassed, and/or raped by Lyft drivers and reported complaints with the Company about their experiences prior to the IPO; (2) it was highly probable that the Company would suffer reputational damage and/or legal liability due to the rampant and increasing amount of sexual assaults committed by Lyft drivers; (3) the braking system on Lyft's electronic bikes was defective and riders sustained injuries such as scrapes, bruising, broken bones, and damaged limbs; (4) riders who were injured as a result of defect in the braking system in Lyft's electric bikes lodged complaints with the Company about their accidents prior to the IPO; (5) safety issues related to the Company's electric bike fleet stifled Lyft's expansion, diversification,

and transformation into a multimodal transportation network; (6) labor disputes with Lyft's drivers, resulting from the Company's policy changes leading up to the IPO, threatened to disrupt Lyft's workforce and significantly impact its business; (7) the Company had suffered a colossal first quarter net loss, totaling over $1.1 billion, more than double the net loss the Company recognized the fiscal year prior; (8) the Company planned to abandon key revenue growth metrics that the Company touted in its Offering Documents as important measurements of Lyft's financial performance and growth; (9) the Company's market share was overstated; and (10) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Individual Defendants' False and Misleading Statements

77.     The Offering Documents used to effectuate Lyft's IPO were false and misleading in that they misled investors with respect to the Company's actual national market share and safety issues regarding the Company's bike-sharing business and labor strikes, all of which were known to, but concealed by, Defendants at the time of the IPO.

78.     The Registration Statement stated the following regarding Lyft's business and market share:

> Our values, brand, innovation and focused execution have driven significant growth in market share and in the number of users on our platform. As ridesharing becomes more mainstream, we believe that users are increasingly choosing a ridesharing platform based on brand affinity and value alignment. Our U.S. ridesharing market share was 39% in December 2018, up from 22% in December 2016. This growth comes from both new drivers and riders as well as increased ride frequency. For the quarter ended December 31, 2018, we had 18.6 million Active Riders and over 1.1 million drivers who provided rides.
>
> Our revenue was $343.3 million, $1.1 billion and $2.2 billion in 2016, 2017 and 2018, respectively, representing year-over-year growth of 209% from 2016 to 2017 and 103% from 2017 to 2018.

79.     The Registration Statement iterated the above statements by making the following statements concerning Lyft's business and market share:

> We operate in a competitive market and must continue to compete effectively in order to grow, improve our results of operations and achieve and maintain long-term profitability. We are one of the largest and fastest-growing multimodal transportation networks in the United States and Canada. Our main ridesharing competitors in the United States and Canada include Uber, Gett (Juno) and Via.

Our main competitors in the bike and scooter sharing market include Uber (Jump), Lime and Bird. We also compete with taxi cab and livery companies, traditional automotive manufacturers and developers of autonomous vehicle technology that may compete with us in the future, including Alphabet (Waymo). Although we face intense competition, our values, brand, innovation and focused execution have driven increased ridesharing market share in the United States, growing from 22% in December 2016 to 39% in December 2018.

80.    In regards to the Motivate acquisition, the Registration Statement said:

We are investing in the expansion of our scooter network and have expanded into shared bikes with our recent acquisition of Motivate, the largest bike sharing platform in the United States.

* * *

On November 30, 2018 (the Closing Date), the Company completed its acquisition of Motivate, a New York-headquartered bikeshare company, for cash consideration of $250.9 million. The purpose of the acquisition is to establish a solid foothold in the bikeshare market and offer access to new transportation options on the Lyft Platform.

* * *

Lyft bikes are standard and electric pedal-assist bicycles. Through our acquisition of Motivate, the largest bike sharing platform in the United States, we are well-positioned to lead sustainable mobility in the markets we serve. This platform brings expertise in managing bike share systems in partnership with cities and local governments across the country, currently operating in nine major cities across the United States. In 2017, there were more than 35 million bike share trips in the United States, of which 74% were on Motivate systems.

81.    In regards, to Lyft's treatment of its drivers, the Registration Statement said,:

**Driver-Centric.**

We focus on providing drivers with a best-in-class experience. From day one, we offered in-app tipping to help drivers maximize earnings. Drivers have access to 24/7 support and earnings tools as well as career coaches, education resources and flexible car rental programs. We are also making significant investments in Driver Hubs, our driver-centric service centers and community spaces, to assist drivers on and off the road. We also introduced subscription offerings to encourage greater ride frequency, thereby providing more earning opportunities for drivers.

* * *

**Personalized, Data-Driven Insights.**

We have collected data from over one billion rides and over ten billion miles driven to inform our machine learning algorithms and data science engines. We leverage insights from this data to improve the product experience for riders by presenting them with personalized transportation options. Our data insights also allow us to anticipate market specific demand, enabling us to create customized incentives for drivers in local markets. We enable riders to optimize routes across multiple modes of transportation which we believe provides us with a significant advantage over single modality providers.

* * *

*Ridesharing Marketplace.*

22

Our core offering since 2012 connects drivers with riders who need to get somewhere. The scale of our network enables us to predict demand and proactively incentivize drivers to be available for rides in the right place at the right time. This allows us to optimize earning opportunities for drivers and convenience for riders, creating sustainable value to both sides of our marketplace.

\* \* \*

**Key Benefits to Drivers**

We work hard to serve the community of drivers on our platform, empowering them to be their own bosses and providing them the opportunity to focus their time on what matters most. Key benefits to drivers on our platform include:

*Flexibility.*

Whether someone is fully-employed or retired, having the flexibility to work when they choose can make a big difference. Drivers can sign up for Lyft easily from their device of choice. After background and safety checks are completed and their application is approved, they can start earning. Drivers can choose to get paid almost instantly with Express Pay or choose to have their earnings deposited on a weekly basis. In select cities, drivers who do not own a vehicle can get a flexible car rental with our Express Drive program in partnership with Hertz, Flexdrive and Avis Budget Group.

*Income.*

Drivers have earned over $10 billion on our platform since inception. Our predictive technology around ride volume and demand enables us to share key information with drivers about when and where to drive in order to maximize their earnings on a real-time basis.

*Trust and Safety.*

Safety is our top priority, and establishing a community built on trust and safety is paramount to our success. We were the first to provide up to $1 million in commercial automobile liability insurance for Transportation Network Company, or TNC, drivers from the moment they are matched with a rider until that rider is dropped off. We also provide drivers support in emergency situations and accidents. In addition, all riders using the Lyft app must provide valid payment credentials and a phone number for identification purposes prior to requesting a ride. All transactions are processed through our platform, so drivers do not need to worry about carrying cash.

*Extensive Support.*

We invest heavily in driver support and are continuously innovating to improve driver experiences. Our Driver Hubs and field locations in major cities serve as gathering places and offer in person support and a personal connection to Lyft employees. In addition, drivers have access to 24/7 support and earnings tools, as well as career coaches, education resources and other support to meet their personal goals.

\* \* \*

**Our Growth Strategy**

\* \* \*

***Invest in Technology to Strengthen Our Network and Increase Efficiency.***

Our investments in proprietary technologies and predictive analytics leverage insights derived from the rich set of data generated by our platform. These investments allow us to deliver an affordable, convenient and high-quality experience for our riders and increase the earnings of drivers. Our investments in mapping, routing, payments, in-app navigation and matching technologies are key to integrating technology and leveraging data science into our platform in order to increase the efficiency of our platform and improve safety. In addition, we are investing in autonomous technology, which we believe will be a critical part of the future of transportation.

\* \* \*

***Optimizing Marketplace Supply***

Once drivers sign up and begin driving, our predictive analytics and dynamic pricing algorithms help us to align driver incentives to encourage drivers to be available, at the right times, in areas of high demand. This helps provide drivers with potentially higher earning opportunities by allowing them to maximize their earnings per hour, which can elevate driver satisfaction, increase supply in peak hours and improve the overall efficiency of the marketplace.

82.    The foregoing statements were materially inaccurate, misleading, and/or incomplete because they failed to disclose, inter alia, that: (1) passengers were physically assaulted, sexually harassed, and/or raped by Lyft drivers and reported complaints with the Company about their experiences prior to the IPO; (2) it was highly probable that the Company would suffer reputational damage and/or legal liability due to the rampant and increasing amount of sexual assaults committed by Lyft drivers; (3) the braking system on Lyft's electronic bikes was defective and riders sustained injuries such as scrapes, bruising, broken bones, and damaged limbs; (4) riders who were injured as a result of defect in the braking system in Lyft's electric bikes lodged complaints with the Company about their accidents prior to the IPO; (5) safety issues related to the Company's electric bike fleet stifled Lyft's expansion, diversification, and transformation into a multimodal transportation network; (6) labor disputes with Lyft's drivers, resulting from the Company's policy changes leading up to the IPO, threatened to disrupt Lyft's workforce and significantly impact its business; (7) the Company had suffered a colossal first quarter net loss, totaling over $1.1 billion, more than double the net loss the Company recognized the fiscal year prior; (8) the Company planned to abandon key revenue growth metrics that the Company touted in its Offering Documents as important measurements of Lyft's financial

performance and growth; (9) the Company's market share was overstated; and (10) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

83.     On May 7, 2019, Lyft issued a press release titled "Lyft Announces Record First Quarter Results," where, conflictingly, the Company disclosed "[f]irst quarter revenue grew to 776 million, up 95% year-over-year" and "[a]ctive riders grew to over 20.5 million in the quarter." Lyft had disclosed a net loss of $1.1 billion versus a net loss of $228.4 million in the first quarter of 2018 and an adjusted loss of $211.5 million and an adjusted net loss of $228.4 million in the first quarter of 2018.

84.     In the May 7, 2019 earnings call related to the Company's first quarter financial results, Defendant Zimmer highlighted the Company's "exclusive bike share operating contracts" as an example of an "area[] of execution that [is] helping [the Company] grow fast at scale." Defendant Roberts reported that "2019 will be our peak loss year" but did not provide any explanation as to how increasing revenue would make up for the enormous net loss the Company experienced in the first fiscal quarter of 2019. In response to an analyst's question regarding the absence of the "Bookings" metrics in the press release, Defendant Roberts assured investors that it was "absolutely a positive metric for [the Company] in the first quarter," but said that the Company was "aggressively investing in new areas including those where revenue equals bookings and so [the Company] really wanted to try to avoid investor confusion" and emphasized that it is "more appropriate for investors to use revenue as the best top line growth metric" and "more important for investors to analyze the performance using revenue going forward."

85.     On May 14, 2019, the Company filed the 1Q19 10-Q with the SEC. The 1Q19 10-Q was executed by Defendants Roberts and Green, together with certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX Act").

86.     The 1Q19 10-Q reported that the Company suffered a record $1.14 billion net loss or $48.53 per share, whereas it had a much smaller $911 million net loss in the year ended

December 31, 2018. The 1Q19 10-Q also showed an adjusted loss at approximately $211 million or $9 per share, which was nearly three times more than expected losses of $3.77 per share that analysts had projected. Further, although the Offering Documents boasted about "key" revenue metrics such as "Bookings" and "Revenue as a Percentage of Bookings," these metrics were absent from the Company's 1Q19 10-Q.

87.     The 1Q19 10-Q disclosed the risks to the Company's "reputation, brand and network effects" and certain safety features, which the Company was allegedly aware of at that time:

> ***Our reputation, brand and the network effects among the drivers and riders on our platform are important to our success, and if we are not able to continue developing our reputation, brand and network effects, our business, financial condition and results of operations could be adversely affected.***
>
> We believe that building a strong reputation and brand as a safe, reliable and affordable platform and continuing to increase the strength of the network effects among the drivers and riders on our platform are critical to our ability to attract and retain qualified drivers and riders. The successful development of our reputation, brand and network effects will depend on a number of factors, many of which are outside our control. Negative perception of our platform or company may harm our reputation, brand and networks effects, including as a result of: complaints or negative publicity about us, drivers on our platform, riders, our offerings or our policies and guidelines, even if factually incorrect or based on isolated incidents;
>
> ***
>
> a failure to operate our business in a way that is consistent with our values and mission; inadequate or unsatisfactory user support service experiences; illegal or otherwise inappropriate behavior by our management team or other employees or contractors;
>
> ***
>
> We rely on third-party background check providers to screen potential drivers, and if such providers fail to provide accurate information or we do not maintain business relationships with them, our business, financial condition and results of operations could be adversely affected.
>
> Any negative publicity related to any of our third-party background check providers, including publicity related to safety incidents or data security breaches, could adversely affect our reputation and brand, and could potentially lead to increased regulatory or litigation exposure. Any of the foregoing risks could adversely affect our business, financial condition and results of operations.

88.     The 1Q19 10-Q provided little detail of the extensive known risks to the Company, including many lawsuits, and instead gave investors generalized statements and downplayed the risks posed by lawsuits:

***Our company culture has contributed to our success and if we cannot maintain this culture as we grow, our business could be harmed.***

We believe that our company culture, which promotes authenticity, empathy and support for others, has been critical to our success. We face a number of challenges that may affect our ability to sustain our corporate culture, including:

\*\*\*

If we are not able to maintain our culture, our business, financial condition and results of operations could be adversely affected.

***We could be subject to claims from riders, drivers or third parties that are harmed whether or not our platform is in use, which could adversely affect our business, brand, financial condition and results of operations.***

\*\*\*

We are regularly subject to claims, lawsuits, investigations and other legal proceedings relating to injuries to, or deaths of, riders, drivers or third parties that are attributed to us through our offerings. We may also be subject to claims alleging that we are directly or vicariously liable for the acts of the drivers on our platform. We may be subject to personal injury claims whether or not such injury actually occurred as a result of activity on our platform. For example, third parties have in the past asserted legal claims against us in connection with personal injuries related to the actions of a driver or rider who may have previously utilized our platform, but was not at the time of such injury. We have incurred expenses to settle personal injury claims, which we sometimes choose to settle for reasons including expediency, protection of our reputation and to prevent the uncertainty of litigating, and we expect that such expenses will continue to increase as our business grows and we face increasing public scrutiny.

\*\*\*

**Personal Injury Matters**
There is no pending or threatened legal proceeding that has arisen from these accidents or incidents that individually, in our opinion, is likely to have a material impact on our business, financial condition or results of operations; however, results of litigation and claims are inherently unpredictable and legal proceedings related to such accidents or incidents, in the aggregate, could have a material impact on our business, financial condition and results of operations. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs individually and in the aggregate, diversion of management resources and other factors. There have been no material changes with respect to these matters as disclosed in our Prospectus.

89.     As to competition and the Motivate acquisition, the 1Q19 10-Q said that "[w]e face intense competition and could lose market share to our competitors, which could adversely affect our business, financial condition and results of operations." The 1Q19 10-Q disclosed risks related to its Motivate acquisition and expansion as follows:

We are continuing to invest in the future, both organically and through acquisitions of complementary businesses. We are investing in the expansion of our scooter

network and have expanded into shared bikes with our recent acquisition of Bikeshare Holdings LLC, or Motivate.

***

***If we are unable to successfully manage the complexities associated with our expanding multimodal platform, our business, financial condition and results of operations could be adversely affected.***

Our expansion into bike and scooter sharing and other modes of transportation has increased the complexity of our business. These new offerings have required us to develop new expertise and marketing and operational strategies, and have subjected us to new laws, regulations and risks. For example, we face the risk that our network of shared bikes and scooters, our Nearby Transit offering, which integrates third-party public transit data into the Lyft App, and other future transportation offerings could reduce the use of our ridesharing offering. If we are unable to successfully manage the complexities associated with our expanding multimodal platform, including the effects our new and evolving offerings have on our existing business, our business, financial condition and results of operations could be adversely affected.

90.     The 1Q19 10-Q outlined further risk factors relating to its bikes as follows:

***The ridesharing market and the market for our other offerings, such as our network of shared bikes and scooters, are still in relatively early stages of growth and if such markets do not continue to grow, grow more slowly than we expect or fail to grow as large as we expect, our business, financial condition and results of operations could be adversely affected.***

The ridesharing market has grown rapidly since we launched our ridesharing marketplace in 2012, but it is still relatively new, and it is uncertain to what extent market acceptance will continue to grow, if at all. In addition, the market for our other offerings, such as our network of shared bikes and scooters, is new and unproven, and it is uncertain whether demand for bike and scooter sharing will continue to grow and achieve wide market acceptance. Our success will depend to a substantial extent on the willingness of people to widely-adopt ridesharing and our other offerings. If the public does not perceive ridesharing or our other offerings as beneficial, or chooses not to adopt them as a result of concerns regarding safety, affordability or for other reasons, whether as a result of incidents on our platform or on our competitors' platforms or otherwise, then the market for our offerings may not further develop, may develop more slowly than we expect or may not achieve the growth potential we expect, any of which could adversely affect our business, financial condition and results of operations.

***

***If we are unable to efficiently grow and further develop our network of shared bikes and scooters, which may not grow as we expect or become profitable over time, and manage the related risks, our business, financial condition and results of operations could be adversely affected.***

***

[T]here may be heightened public skepticism of this nascent service offering. In particular, there could be negative public perception surrounding bike and scooter sharing, including the overall safety and the potential for injuries occurring as a

result of accidents involving an increased number of bikes and scooters on the road. Such negative public perception may result from incidents on our platform[.]

\*\*\*

Our bikes and scooters or components thereof, including bikes and scooters and components that we design and contract to manufacture using third-party suppliers, may experience quality problems or defects from time to time, which could result in decreased usage of our network of shared bikes and scooters. There can be no assurance we will be able to detect and fix all defects in our bikes and scooters. Failure to do so could result in lost revenue, litigation or regulatory challenges, including personal injury or products liability claims, and harm to our reputation.

91.     The risks outlined in the 1Q19 10-Q further described these alleged risks as "possible", rather than "known" and "certain" risks, stating that there could be "adverse[] affect [on the Company's] business, brand, financial condition and results of operations" associated with "claims from riders, drivers or third parties that are harmed" and further:

***Our bikes … may experience quality problems from time to time, which could result in product recalls, injuries, litigation, enforcement actions and regulatory proceedings, and could adversely affect our business, brand, financial condition and results of operations.***

\*\*\*

We design and contract to manufacture, and directly and indirectly modify, maintain and repair, bikes and scooters for our network of shared bikes and scooters. Such bikes and scooters may contain defects in their design, materials and construction or may be improperly maintained or repaired. These defects or improper maintenance or repair could unexpectedly interfere with the intended operations of the bikes or scooters, which could result in injuries to riders.

\*\*\*

As we expand our network of shared bikes and scooters, we may be subject to an increasing number of claims, lawsuits, investigations or other legal proceedings related to injuries to, or deaths of, riders of our bikes and scooters. Any such claims arising from the use of our bikes and scooters, regardless of merit or outcome, could lead to negative publicity, harm to our reputation and brand, significant legal, regulatory or financial exposure or decreased use of our bikes and scooters.

92.     Further, the 1Q19 10-Q provided that "[i]f we fail to cost-effectively attract and retain qualified drivers, or to increase utilization of our platform by existing drivers, our business, financial condition and results of operations could be harmed." However, the 1Q19 10-Q continued to couch risks such as "strikes or other work stoppages" as potential risks "that could adversely affect our users and our business."

93.     The statements referenced above were materially false and misleading because they failed to disclose, inter alia, that: (1) passengers who were verbally and physically assaulted,

sexually harassed, and/or raped by Lyft drivers reported complaints with the Company about their experiences prior to the IPO; (2) it was highly probable that the Company would suffer reputational damage and/or legal liability due to the rampant and increasing amount of sexual assaults committed by Lyft drivers; (3) the braking system on Lyft's electronic bikes was defective and riders sustained injuries such as scrapes, bruising, broken bones, and damaged limbs; (4) riders who were injured as a result of defect in the braking system in Lyft's electric bikes lodged complaints with the Company about their accidents prior to the IPO; (5) safety issues related to the Company's electric bike fleet stifled Lyft's expansion, diversification, and transformation into a multimodal transportation network; (6) labor disputes with Lyft's drivers, resulting from the Company's policy changes leading up to the IPO, threatened to disrupt Lyft's workforce and significantly impact its business; (7) the Company's market share was overstated; and (8) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### F.   The Truth is Revealed

94.     The true facts regarding the Company's state of affairs and significant omissions and non-disclosures of risks in the Offering Documents began to emerge after the Offering as a result of media reports, lawsuits, and conflicting information about Lyft's market share. It is highly plausible that the Company omitted this material information due to fears that full disclosure of these risks may place it at a disadvantage to its main competitor, Uber. Soon after its IPO, Lyft's stock price declined as investors raised concerns that Lyft's reported market share and other omissions in its Offering Documents meant the Company's financial situation risk of liability may not have been as positive as it had touted to investors in its IPO documents.

95.     Just after the IPO, on April 2, 2019, Guggenheim Partners published an analyst report titled "LYFT claims that U.S. share has ramped from 22% in 2016 to 39% in 2018. Our own Google Trends analysis comparing share of search volume across top ride-hail markets puts LYFT share at 24%."

96.     On this news, the price of the Company's stock fell approximately 11.9%, or $9.28,

tumbling from $78.29 per share at the close of trading on March 29, 2019 to $69.01 per share at the close of trading on April 1, 2019.

97.     One week afterward, well publicized incidents of sexual assault, and the related mounting lawsuits against Lyft, surfaced. For example, an article published by the San Francisco Chronical on April 9, 2019 exposed the extensive safety issues and reports of sexual harassment in Lyft's network.

98.     On this news, the price of the Company's stock continued to fall, closing at $60.12 per share on April 10, 2019.

99.     After mounting injuries associated with the braking system used on the electric bikes contained in Lyft's network, as described above, Lyft removed about 3,000 electric bikes from service in its bike-share program in New York, Washington D.C., and San Francisco on April 14, 2019.

100.     Following widespread media coverage of Lyft pulling these bikes, the price of the Company's stock fell over 6.3%, or $3.79, dropping from $59.90 per share at the close of trading on the previous trading day, April 12, 2019, to $56.11 per share at the close of trading on April 15, 2019.

101.     On May 6, 2019, the Verge reported that "[l]abor groups organizing the strike are protesting the companies' payment and labor practices" and that, specifically, workers are demanding "fewer driver deactivations, an end to upfront pricing, and a cap on the per-fare commission taken by ride-hail companies." The Verge article further stated that "[t]he planned strikes appear to be more organized and geographically diverse than the protests that met Lyft's IPO in late March, which were mostly localized in California."

102.     On this news, the price of the Company's stock fell over 3.1%, or $1.94, from $62.51 per share at the close of trading on the previous trading day, May 3, 2019, to $60.57 per share at the close of trading on May 6, 2019.

## V.     FIDUCIARY DUTIES

103.     By reason of their positions as officers and directors of the Company, each of the

Individual Defendants owed and continues to owe Lyft and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Lyft in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Lyft and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

104.    Each Individual Defendant owes and continues to owe Lyft and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

105.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lyft, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Lyft, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

106.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b) conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c) remain informed as to how Lyft conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d) truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

## A.  Duties Pursuant to the Company's Code of Business Conduct and Ethics

107.  The Individual Defendants, as officers and/or directors of Lyft, were bound by the Company's Code of Business Conduct[19] (the "Code of Conduct") which required the following:

### A. Purpose

This Code is intended to ensure and promote:

1. a culture of honesty and accountability;
2. honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest;
3. fair and accurate books and records, including financial reporting;
4. ethical conduct and compliance with applicable laws, rules and regulations including, without limitation, full, fair, accurate, timely and understandable disclosure in reports and documents we file with or submit to the Securities and Exchange Commission and in our other public communications;
5. the prompt internal reporting of violations of this Code, as set forth in this Code; and
6. the deterrence of wrongdoing.

### B. Financial Reports and Other Records – Disclosure

Team members are responsible for the accurate and complete reporting of financial information within their respective areas of responsibility and for the timely notification to senior management of financial and non-financial information that may be material to the company. The company expects all of its team members to take this responsibility very seriously to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the company files with government agencies or releases to the general public. Each team member, to the extent involved in the company's disclosure process, including without limitation, the principal executive officer, principal financial officer and other senior team members who perform similar functions in the company (collectively, "Senior Financial Officers"), must familiarize themselves with the disclosure requirements applicable to the company as well as the business and financial operations of the company, and must not knowingly misrepresent, or cause others to misrepresent, facts about the company to others, whether within or outside the company, including to the company's independent auditors, governmental regulators and self-regulatory organizations.

All of the company's books, records, accounts and financial statements must be maintained in reasonable detail, and reflect the matters to which they relate

---

[19] See Lyft Code of Business Conduct:

https://investor.lyft.com/static-files/8861ea0b-6a32-4414-a909-d8a9618f582f

accurately, fairly and completely.

Furthermore, all books, records, accounts and financial statements must conform both to applicable legal requirements and to the company's system of internal controls. All assets of the company must be carefully and properly accounted for. No undisclosed or unrecorded account or fund will be established for any purpose. No false or misleading entries will be made in the company's books or records for any reason, and no disbursement of corporate funds or other corporate property will be made without adequate supporting documentation and authorization. Misclassification of transactions as to accounts, business units or accounting periods is forbidden. Each team member bears responsibility for ensuring that they are not party to a false or misleading accounting entry. This means we cannot make any promises that are not detailed in the documentation that has been fully reviewed by the appropriate departments. Failure to be transparent and to follow the correct approval and documentation process can cause problems for you and the company.

108. In addition to these duties, the Individual Defendants who served on the Audit Committee during the Relevant Period, the Audit Committee Defendants, owed specific duties to Lyft under the Audit Committee Charter (the "Audit Charter").[20] Specifically the Audit Charter provided for the following responsibilities of the Audit Committee Defendants to:

The purpose of the Committee is to assist the Board in fulfilling its responsibilities for overseeing:

- The Company's accounting and financial reporting processes and internal controls, as well as the audit and integrity of the Company's financial statements.
- The qualifications, independence and performance of the Company's registered public accounting firm (the "**independent auditor**").
- The design, implementation and performance of the Company's internal audit function.
- The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).
- The Company's ethical compliance programs, including the adequacy and effectiveness of initiatives related to values and ethics.
- The Company's policies with respect to risk assessment and risk management pertaining to the financial, accounting and tax matters of the Company.

**RESPONSIBILITIES**
The following are the principal recurring responsibilities of the Committee. The Committee may perform such other functions as are consistent with its purpose and applicable law, rules and regulations and as the Board may request. In carrying out its responsibilities, the Committee believes its policies and procedures should

---

[20] See Lyft Audit Committee Charter at:
https://investor.lyft.com/static-files/4ca0e7d5-c582-4121-8623-c60d9ec53226

34

remain flexible, in order to best react to changing conditions and circumstances.

\*\*\*

5. <u>Review Financial Statements</u>. The Committee shall review and discuss the following with management, the internal auditors, if applicable, and the independent auditor, as applicable:

- The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.
- The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the annual financial statements.
- Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.
- Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements.
- The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.
- Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

6. <u>Reports and Communications from the Independent Auditor</u>. The Committee shall review and discuss quarterly reports from the independent auditor concerning the following:

- Critical accounting policies and practices to be used by the Company.
- Alternative treatments of financial information within GAAP that the auditor has discussed with management, ramifications of the use of these alternative disclosures and treatments, and the treatment preferred by the independent auditor if different from that used by management.
- Any material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.
- Any matters required to be communicated to the Committee under generally accepted auditing standards and other legal or regulatory requirements, including any matters required to be communicated under applicable auditing standards.

7. <u>Committee Report</u>. The Committee will prepare the report of the Committee that SEC rules require to be included in the Company's annual proxy statement.

\*\*\*

9. <u>Internal Controls</u>. The Committee shall review and discuss with management, the internal auditors, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted

or changes required in light of any material control deficiencies, the reports and certifications regarding internal control over financial reporting and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

10. <u>Disclosure Controls and Procedures</u>. The Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures and the reports and certifications over disclosure controls and procedures.

\*\*\*

12. <u>Risk Assessment and Risk Management</u>. The Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management pertaining to financial, accounting and tax matters. The Committee will also provide oversight of risks and exposures associated with cybersecurity matters. The Committee will also review the Company's risk management framework and programs, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees.

13. <u>Legal and Regulatory Compliance</u>. The Committee shall:
- Review and discuss with management, the internal auditors, if applicable, and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs.
- Discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.
- Discuss with a senior member of the Company's legal department any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

14. <u>Complaints</u>. The Committee shall establish and oversee procedures for the receipt, retention and treatment of complaints on accounting, internal accounting controls or audit matters, as well as for confidential and anonymous submissions by the Company's employees concerning questionable accounting or auditing matters

## VI.   <u>BREACHES OF DUTIES</u>

109.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Lyft, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

110.   The Individual Defendants breached their duty of loyalty and good faith by utterly

failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the extensive problems the Company was encountering, of which Individual Defendants were aware of prior to its IPO, namely the overstatement of market share and misleading statements or omissions as to business activities, lawsuits related to sexual assaults by its drivers on passengers, and failures of breaking systems on bikes in its fleets and disruptions to operations and labor due to its drivers striking. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Lyft substantial damage.

111.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Lyft's public statements and internal control function.

112.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Lyft, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Lyft has expended, and will continue to expend, significant sums of money.

## VII.    DAMAGES TO LYFT

113.    The improper accounting practices have exposed the Company to myriad reputation and financial damages, including but not limited to:

(a)  Possible restatements and goodwill impairments;

(b)  Liability arising from the Securities Class Actions;

1    (c)  The loss of credibility with customers and suppliers; and

2    (d)  Legal and accounting costs associated with litigation, investigations and restatements.

3                    **VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

4        114.    Plaintiff brings this action derivatively and for the benefit of Lyft to redress injuries

suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary

duties as directors and/or officers of Lyft, waste of corporate assets, unjust enrichment, abuse of

control, gross mismanagement and violations of Sections 11, 12(a) (2), and 15 of the Securities

Act, as well as the aiding and abetting thereof.

9        115.    Lyft is named solely as a nominal party in this action. This is not a collusive action

to confer jurisdiction on this Court that it would not otherwise have.

11       116.    Plaintiff is, and has been continuously at all relevant times, a stockholder of Lyft.

Plaintiff will adequately and fairly represent the interests of Lyft in enforcing and prosecuting its

rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to

enforce and prosecute this action.

15       117.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if

fully set forth herein.

17       118.    A pre-suit demand on the Board of Lyft is futile and, therefore, excused. At the

time of filing of this action, the Board consists of defendants Zimmer, Green, Aggarwal, Lawee,

Miura-Ko, Wilderotter, and Jarrett. Plaintiff needs only to allege demand futility as a majority of

the Directors who are on the Board at the time this action is commenced.

21       119.    Demand is futile on Defendant Zimmer because he is the co-founder of the

Company and has served as the Company's President since March 2013, the Company's Vice

Chairman since January 2019, and as a Company director since June 2010. Therefore, he is a non-

independent director. The Company provides Defendant Zimmer with his primary source of

income and occupation. Defendant Zimmer was responsible and involved in the false and

misleading statements and omissions that were made, including those contained in the Offering

Documents, May 2019 Press Release, and during the May 2019 Earnings Call.

120.    Demand is futile on Defendant Green because he is the co-founder of the Company, has served as the Company's CEO, and has served as a Company director since the Company's founding in 2007. Therefore, he is a non-independent director. Defendant Green's principal occupation and income is with the Company. Green was involved in the false and misleading statements and omissions that were made, including, but not limited to, those contained in the Offering Documents, May 2019 Press Release, during the May 2019 Earnings Call, and in the Company's recent filings with the SEC, including the 1Q19 10-Q, which he executed.

121.    Defendants Zimmer and Green co-founded the Company, building Lyft together. Because of these long-time personal and professional connections, and in light of the substantial likelihood of liability that each of them faces in the Securities Class Actions, they would be unable to evaluate a demand with disinterest or independence.

122.    Directors are controlled by Defendants Zimmer and Green who control the Company by virtue of their collective beneficial share ownership. These shareholdings provide Defendants Zimmer and Green and with significant control over the Directors. The Directors are beholden to Defendants Green and Zimmer because of the Directors' large compensation packages. Directors are unable to evaluate a demand with disinterest or independence as a result of Zimmer and Green's substantial likelihood of liability in the Securities Class Actions.

123.    Demand is futile on Defendant Aggarwal because he served as the Chairman of the Board since January 2019 and as a Company director since February 2016. He also serves as a member of the Audit Committee and Compensation Committee and receives his principal livelihood and occupation from the Company. Defendant Aggarwal signed, and thus personally made, the false and misleading statements in the Registration Statement. Further, Defendant Aggarwal is a defendant in the Securities Class Actions.

124.    Demand is futile on Defendant Lawee because he has served as a Company director since November 2017. He also serves as the Chairperson of the Compensation Committee and is a member of the Nominating and Corporate Governance Committee. Defendant Lawee has received and continues to receive his primary source of compensation for his role as a director at

the Company. Defendant Lawee signed, and thus personally made, the false and misleading statements in the Registration Statement. Additionally, Defendant Lawee is a defendant in the Securities Class Actions.

125.    Demand is futile on Defendant Miura-Ko because Defendant Miura-Ko has served as a Company director since June 2016 and previously served as a Company director from June 2010 to May 2013. She also serves as the Chairperson of the Nominating and Corporate Governance Committee. Defendant Miura-Ko has received and continues to receive compensation for her role as a director. Defendant Miura-Ko signed, and thus personally made, the false and misleading statements in the Registration Statement. Moreover, Defendant Miura-Ko is a defendant in the Securities Class Actions.

126.    Demand is futile on Defendant Wilderotter because she has been a Company director since May 2018. She also serves as the Chairperson of the Audit Committee. Defendant Wilderotter signed, and thus personally made, the false and misleading statements in the Registration Statement. Further, Defendant Wilderotter is a defendant in the Securities Class Actions. For these reasons, Defendant Wilderotter breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon her is futile and, therefore, excused.

127.    Demand is futile on Defendant Jarrett because Defendant Jarrett has served as a Company director since July 2017. She also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Jarrett has received and continues to receive her primary source of compensation for her roles at the Company. Additionally, Defendant Jarrett signed, and thus personally made, the false and misleading statements in the Registration Statement. Further, Defendant Jarrett is a defendant in the Securities Class Actions.

128.    Demand in this case is excused as to the Director Defendants referenced in the paragraphs above, all of whom are named as defendants in this action, and some of whom are defendants in the Securities Class Actions, and have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting

independently and in the best interests of the Company and the shareholders. Four of the seven Directors have served on the Board for four years or more. These conflicts of interest prevents the Directors from property monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.

129.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to make and cause the Company to make, and to fail to correct, materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them. Lyft has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Lyft any part of the damages Lyft suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

130.   Demand is excused as to all of the above-mentioned Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

131.   In complete abdication of their fiduciary duties, the above-mentioned Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was

intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the above-mentioned Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

132.     As trusted Company directors, the above directors conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Directors breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

133.     The Audit Committee Defendants served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes and internal controls, the integrity of the Company's financial statements, the Company's compliance with applicable laws, and the Company's risk assessment and risk management policies relating to financial and accounting matters. The Audit Committee Defendants were also responsible for reviewing and discussing with management the Company's disclosures in its periodic reports with the SEC and earnings press releases. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes and internal controls as they are charged to do under the Audit Committee Charter, and allowed the Company to issue false and misleading statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

134.     Lyft has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Lyft any part of the damages Lyft suffered and will continue to suffer thereby. Thus, any demand upon

the Director Defendants would be futile.

135.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

136.   The acts complained of herein constitute violations of fiduciary duties owed by Lyft's officers and directors, and these acts are incapable of ratification.

###   A.   **Insurance Considerations**

137.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Lyft. If there is a directors and officers' liability insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Individual Defendants were to sue themselves or certain officers of Lyft, there would be no directors' and officers' insurance protection. Accordingly, the Director Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Individual Defendants is futile and, therefore, excused.

138.   If there is no directors' and officers' liability insurance, then the Director Individual Defendants will not cause Lyft to sue any other wrongdoers, since, if they did, they would face a

1    large uninsured individual liability. Accordingly, demand is futile in that event, as well.

2    139.    Thus, for all the reasons set forth above, all of the Director Individual Defendants,

3    and, if not all of them, at least a majority of Directors, cannot consider a demand with

4    disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## IX.    FIRST CLAIM

### Against Individual Defendants

### for Breach of Fiduciary Duties

8    140.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

9    above, as though fully set forth herein.

10    141.    Each Individual Defendant owed to the Company the duty to exercise candor, good

11    faith, and loyalty in the management and administration of Lyft's business and affairs.

12    142.    Each of the Individual Defendants violated and breached their fiduciary duties of

13    candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

14    143.    The Individual Defendants' conduct set forth herein was due to their intentional or

15    reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

16    Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the

17    rights and interests of Lyft.

18    144.    In breach of their fiduciary duties, the Individual Defendants caused the Company

19    to engage in the misconduct described herein.

20    145.    In further breach of their fiduciary duties, the Individual Defendants failed to

21    maintain an adequate system of oversight, disclosure, controls, and procedures.

22    146.    Also in breach of their fiduciary duties, the Individual Defendants willfully or

23    recklessly made and/or caused the Company to make false and misleading statements during the

24    Relevant Period, namely, major problems which included the overstatement of market share and

25    misleading statements or omissions as to business activities, lawsuits related to sexual assaults by

26    its drivers on passengers and failures of breaking systems on bikes in its fleets and disruptions to

27    operations and labor, due to its drivers striking.

28

147.     The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

148.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

149.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

150.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

151.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lyft has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

152.     Plaintiff on behalf of Lyft has no adequate remedy at law.

## X.    SECOND CLAIM

### Against Individual Defendants

### for Unjust Enrichment

153.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Lyft.

155.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Lyft tied to the performance or artificially inflated valuation of Lyft, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

156.    Plaintiff, as a stockholder and a representative of Lyft, seeks restitution from the Director Individual Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

157.    Plaintiff on behalf of Lyft has no adequate remedy at law.

## XI.    THIRD CLAIM

### Against Individual Defendants

### for Waste of Corporate Assets

158.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

159.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and Lyft will lose financing from investors and business from future customers who no longer trust the Company and its products.

160.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

161.    Plaintiff on behalf of Lyft has no adequate remedy at law.

## XII.    <u>FOURTH CLAIM</u>

### Against the Individual Defendants for Abuse of Control

162.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Lyft, for which they are legally responsible.

164.    As a direct and proximate result of the Individual Defendants' abuse of control, Lyft has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Lyft has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

165.    Plaintiff on behalf of Lyft has no adequate remedy at law.

## XIII.  <u>FIFTH CLAIM</u>

### Against the Individual Defendants for Gross Mismanagement

166.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Lyft in a manner consistent with the operations of a publicly-held corporation.

168.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Lyft has sustained and will continue to sustain significant damages.

169.    As a result of the misconduct and breaches of duty alleged herein, the Individual

Defendants are liable to the Company.

170.    Plaintiff on behalf of Lyft has no adequate remedy at law.

## XIV.   SIXTH CLAIM

### Against the Individual Defendants for Contribution

## XV.    PURSUANT TO SECTION 11(F) OF THE SECURITIES ACT AND SECTION 21D OF THE EXCHANGE ACT

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    Due to the conduct and events alleged herein, the Company has been named as a defendant in the Securities Class Actions brought on behalf of Lyft shareholders in which the Company is a joint tortfeasor in claims brought under Sections 11, 12(a)(2), and 15 of the Securities Act. Federal law provides Lyft with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

173.    The plaintiffs in the Securities Class Actions allege that the Registration Statement for the IPO was inaccurate and misleading, included untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

174.    The Defendants named herein were responsible for the contents and dissemination of the Registration Statement. Lyft is the registrant for the IPO.

175.    As issuer of the shares, Lyft is strictly liable to plaintiffs and the class for the misstatements and omissions alleged in the Securities Class Actions.

176.    The plaintiffs in the Securities Class Actions allege that none of the Individual Defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

177.    The Individual Defendants, because of their positions of control and authority as officers and directors of Lyft, were able to and did, directly and/or indirectly, exercise control over

the business and corporate affairs of Lyft, including the wrongful acts complained of herein and in the Securities Class Actions.

178.    Thus, the Individual Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which imposes a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which allows  for the application of a private right of action for contribution arising out of violations of the Securities Act. As such, Lyft is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

## XVI.   PRAYER FOR RELIEF

179.    **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.  Declaring that Plaintiff may maintain this action on behalf of Lyft, and that Plaintiff is an adequate representative of the Company;

B.  Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Lyft;

C.  Determining and awarding to Lyft the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.  Directing Lyft and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Lyft and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

E.  A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

F.  A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

G.  Awarding Lyft restitution from Individual Defendants;

H.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

I.  Granting such other and further relief as the Court may deem just and proper.

Dated: December 21, 2020                    **LEVI & KORSINSKY, LLP**

                                 By: /s/ *Rosanne L. Mah*
                                    Rosanne L. Mah
                                    Email: rmah@zlk.com
                                    388 Market Street, Suite 1300
                                    San Francisco, California 94111
                                    Telephone: (415) 373-1671
                                    Facsimile: (415) 484-1294

                                    Gregory M. Nespole (*pro hac vice* forthcoming)
                                    Email: gnespole@zlk.com
                                    **LEVI & KORSINSKY, LLP**
                                    55 Broadway, 10th Floor
                                    New York, New York 10006
                                    Telephone: (212) 363-7500
                                    Facsimile: (212) 363-7171

                                    *Attorneys for Plaintiff Ron Chenoy*

## VERIFICATION

     I, Ron Chenoy, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Signed:

Print Name: Ron Chenoy                    Date: 11-23-2020