1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6
7    RON CHENOY,                          Case No. 20-cv-09257-HSG
8              Plaintiff,                 **ORDER GRANTING FINAL**
                                          **APPROVAL OF SHAREHOLDER**
9         v.                              **DERIVATIVE ACTION SETTLEMENT**
10   LYFT, INC., et al.,                  Re: Dkt. No. 68
11             Defendants.
12

13        Pending before the Court is Plaintiffs' unopposed motion for final approval of shareholder

14   derivation action settlement, attorneys' fees and expenses, and service award allocations.  *See* Dkt.

15   No. 68 ("Mot.").[1]  The Court held a final fairness hearing on February 6, 2025.  For the reasons

16   stated below, the Court GRANTS the motion and applies a downward adjustment to the attorneys'

17   fee award.

18   **I.    BACKGROUND**

19        **A.    Factual Allegations**

20        This is a shareholder derivative action on behalf of nominal defendant Lyft, Inc. ("Lyft")

21   against several Lyft officers and directors (collectively "Individual Defendants").[2]  Plaintiffs

22   allege that the Individual Defendants breached their fiduciary duty by failing, among other things,

23   to: "(1) prevent or remediate the rampant sexual and physical assault committed by Lyft drivers

24   against Lyft passengers; (2) provide an adequate reporting mechanism, oversight of personnel,

25   _____

26   [1] For ease of reference, the Court refers to PDF page numbers rather than documents' internal
     pagination unless otherwise noted.
27   [2] The "Individual Defendants" include Logan Green, John Zimmer, Brian Roberts, Prashant
     (Sean) Aggarwal, Jonathan Christodoro, Ben Horowitz, Valerie Jarrett, David Lawee, Hiroshi
28   Mikitani, Ann Miura-Ko, and Mary Agnes (Maggie) Wilderotter.

training, or disciplinary avenues to prevent or at least remedy the known problem of sexual and physical assault; or (3) implement an adequate background check system to effectively screen Lyft drivers, particularly drivers with known histories of committing past acts of sexual misconduct and/or harassment."  Dkt. No. 60 at 9–10; Verified Shareholder Derivative Complaint ("Compl.") ¶ 19.  Plaintiffs further allege that these Individual Defendants made "a series of false and misleading statements in connection with Lyft's March 28, 2019 initial public offering ("IPO")." Dkt. No. 60 at 10; Compl. ¶¶ 1, 16.  According to Plaintiffs, the alleged false and/or misleading statements failed to disclose that: "(1) passengers had reported to Lyft being verbally and physically assaulted, sexually harassed, and raped by Lyft drivers even prior to the IPO; (2) it was likely that Lyft would sustain damage to its reputation and also be subject to legal liability as a consequence of numerous and still increasing sexual assaults perpetrated by the Company's drivers; (3) numerous riders of the Company's electronic bikes were caused to sustain injuries such as scrapes, bruising, broken bones, and damaged limbs as a result of a defect in the braking system of Lyft's electronic bikes; (4) riders injured by the defective braking system had complained to the Company before Lyft went public on March 28, 2019; (5) Lyft's transformation into a multimodal transportation network was being disrupted by safety issues with their bikes; and (6) Lyft failed to maintain internal controls."  Compl. at ¶ 16.

Based on this alleged misconduct, Plaintiffs assert claims on behalf of Lyft against the Individual Defendants for alleged breaches of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Section 11(f) of the Securities Act of 1933 and Section 21D of the Securities Exchange Act of 1934.  Dkt. No. 60 at 7.

### B.    Procedural Background

This consolidated action combines four federal shareholder derivative actions filed against the Individual Defendants on behalf of nominal defendant Lyft between September 2020 and February 2021.  In January 2021, then-Magistrate Judge Jacqueline Scott Corley consolidated three of these actions: *Mehta v. Green*, Case No. 1:20-cv-01326 (D. Del.) (later Case No. 4:20-cv-09364 (N.D. Cal.)), *Chenoy v. Zimmer*, Case No. 4:20-cv-09257 (N.D. Cal.), and *Hong Kok v.*

2

*Green*, Case No. 3:20-cv-09272 (N.D. Cal.). Dkt. No. 60 at 11; Dkt. No. 9.  In February 2021, Plaintiff Brad Shuman filed a similar shareholder derivative action, *Shuman v. Green*, Case No. 4:21-cv-01263 (N.D. Cal.), which the Court also consolidated into the above-captioned action. Dkt. No. 37.

In February 2021, the Court granted the parties' request to stay this consolidated case in light of *In re Lyft, Inc. Securities Litigation*, No. 4:19-cv-02690 ("Federal Securities Action"), a factually-related securities class action then pending before the Court.  *See* Dkt. No. 34.  The parties in that case reached a class-wide settlement, which the Court approved in August 2023, and the Federal Securities Action was dismissed in October 2023.  Dkt. No. 60 at 13.  Following the Court's approval of the parties' class action settlement in the Federal Securities Action, the parties reached a settlement in this matter.  Dkt. No. 51.  In July 2024, Plaintiffs filed an unopposed motion for preliminary approval of the settlement, Dkt. No. 60, and in October 2024, the Court "preliminarily [found] that the Settlement Agreement is fair, reasonable, and adequate" and granted that motion.  Dkt. No. 62; *In re Lyft, Inc. Derivative Litig.*, No. 20-CV-09257-HSG, 2024 WL 4505474, at *6 (N.D. Cal. Oct. 16, 2024).  The Court also directed the parties to finalize and implement the proposed notice plan.  *Id*.

### C.    Settlement Agreement

The key terms of the Stipulation of Settlement, Dkt. No. 60-2 ("Settlement Agreement" or "SA"), are as follows:

Settlement Benefits: Lyft will keep the corporate governance reforms set forth in Exhibit A of the Settlement Agreement in place for at least three years.  *See* Dkt. No. 60-2, Ex. A.  These reforms include, among other things, Lyft's amended Clawback Policy, changes to Lyft's Code of Business Conduct and Ethics, amendments to Lyft's Compensation Committee Charter, and changes to Lyft's Corporate Governance Guidelines.  *Id.*  Lyft will also post a link to its Compliance and Ethics Hotline on the Lyft website within 90 days of the settlement's final approval.  *Id.*  Consistent with Exhibit A of the Settlement Agreement, Lyft will undertake efforts to improve safety compliance and awareness by (1) adding a user safety executive to Lyft's Culture of Ethics and Compliance Committee, and (2) promoting safety features like the "Alert

United States District Court
Northern District of California

911 Safety Feature" and "Safety Phone Calls." *Id.* Within 12 months of the settlement's final approval, Lyft will also make at least one further post on its blog (https://www.lyft.com/blog) about in-app safety features available to riders and drivers. *Id.*

Releases: Under the terms of the Settlement Agreement, the "Releasing Persons shall be deemed to have fully, finally, and forever released, relinquished, and discharged the Released Claims (including Unknown Claims) against the Released Persons and any and all derivative claims arising out of, relating to, or in connection with the defense, settlement, or resolution of the Federal Derivative Actions against the Released Persons." SA § 5.1.

- The Releasing Persons are "Plaintiffs (individually, collectively, and derivatively on behalf of Lyft), all other Applicable Lyft Shareholders, Plaintiffs' Counsel, and Lyft." *Id.* § 1.23.

- The Released Persons are "Lyft, the Individual Defendants, and their Related Persons." *Id.* § 1.22.

- Released Claims means "[A]ny and all actions, suits, claims, debts, rights, liabilities, and causes of action, whether under federal, state, local, statutory, common law, foreign law, or any other law, rule or regulation, including both known and Unknown Claims (as defined in paragraph 1.26 below), that: (a) were asserted or could have been asserted by any shareholder derivatively on behalf of Lyft, or by Lyft, against any Released Person; and (b) concern, arise out of, or relate to (i) the allegations asserted in the Federal Derivative Actions or the matters and occurrences that were alleged in the Federal Derivative Actions, or (ii) the Settlement, defense or resolution of the Federal Derivative Actions, except for any claims to enforce the Settlement. Excluded from the term 'Released Claims' are all claims alleged in the Federal Securities Action and the State Securities Action." *Id.* § 1.21.

Notice: Lyft provided notice of the Settlement Agreement consistent with the proposed notice plan. *See* Dkt. Nos. 60-2, Ex. C ("Notice"), 60-2, Ex. D ("Summary Notice"); SA § 3.2.5. Specifically, (1) Lyft published the Summary Notice in the national edition of *Investor's Business Daily*, (2) Plaintiffs' counsel published the Summary Notice via *PR Newswire*, and (3) Lyft posted the relevant notice materials on a webpage that was accessible from the "Investors" page of Lyft's website. Mot. at 15; Dkt. No. 70.

4

United States District Court
Northern District of California

1    Attorneys' Fees and Costs: Plaintiffs' counsel seeks $700,000 in attorneys' fees and expenses

2    from the Individual Defendants' insurers for the 764.05 hours that counsel worked on this matter.

3    Mot. at 24–25.

4    Service Award: Plaintiffs' counsel requests $1,500 service awards for the three named plaintiffs.

5    Mot. at 27–28.  These awards will be drawn from funds allocated for Plaintiffs attorneys' fees and

6    expenses.

7    **II.    FINAL SETTLEMENT APPROVAL**

8    **A.    Legal Standard**

9        Pursuant to Federal Rule of Civil Procedure 23.1, "[a] derivative action may be settled,

10   voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23.1(c).

11   "Rule 23 requires courts to employ a two-step process in evaluating a class action or derivative

12   action settlement."  *In re Wells Fargo & Co. Sharehold Derivative Litig.*, No. 16-CV-05541-JST,

13   2019 WL 13020734, at *4 (N.D. Cal. May 14, 2019).  First, the court "must make a preliminary

14   determination that the settlement is fair, reasonable, and adequate" under Rule 23(e)(2).  *Id.*

15   (internal citation and quotations omitted).  Only if a settlement is "fundamentally fair, adequate,

16   and reasonable" may it be approved.  *In re Hewlett-Packard Co. S'holder Derivative Litig.*, No.

17   3:12-CV-06003-CRB, 2015 WL 1153864, at *3 (N.D. Cal. Mar. 13, 2015) (internal citation and

18   quotations omitted).  "[I]f the court preliminarily approves a derivative action settlement, notice

19   'must be given to shareholders or members in the manner that the court orders.'"  *In re Wells*

20   *Fargo & Co. Sharehold Derivative Litig.*, 2019 WL 13020734, at *4 (quoting Fed. R. Civ. P.

21   23.1(c)).  The court then holds a hearing to "make a final determination whether the settlement is

22   'fair, reasonable, and adequate.'"  *Id.* (quoting Fed. R. Civ. P. 23(e)(2)).

23       In the context of a derivative action, courts evaluate fairness, reasonableness, and adequacy

24   by considering a range of factors, such as "the strength of the plaintiffs' case; the risk, expense,

25   complexity, and likely duration of further litigation; . . . the amount offered in settlement; the

26   extent of discovery completed and the stage of the proceedings; [and] the experience and views of

27   counsel . . . "  *Id.* (internal citation and quotations omitted).  Courts also consider "the extent of the

28   benefit to be derived from the proposed settlement by the corporation, the real party in interest."

1    *In re Pinterest Derivative Litig.*, No. C 20-08331-WHA, 2022 WL 484961, *3 (N.D. Cal. Feb. 16,

2    2022) (internal citation and quotations omitted).  And courts ensure that the proposed settlement is

3    not "the product of fraud or overreaching by, or collusion between, the negotiating parties," *In re*

4    *Hewlett-Packard*, 2015 WL 1153864, at *3 (internal citation and quotation omitted).  *See also*

5    *Lloyd v. Gupta*, No. 15-CV-04183-MEJ, 2016 WL 3951652, at *4 (N.D. Cal. July 22, 2016)

6    (internal citation and quotations omitted) (noting that courts consider whether "the settlement is

7    the result of arm's-length negotiations in which plaintiffs' counsel has effectively represented the

8    interest of the shareholder class, and whether the substantive terms of the settlement are in the

9    interests of [the company] and its shareholders relative to the likely rewards of litigation.").

**B.    Discussion**

    **i.    Adequacy of Notice**

12        Rule 23.1(c) requires that notice of the settlement "be given to shareholders or members in

13    the manner that the court orders."  Fed. R. Civ. P. 23.1(c).  This requirement "guards against

14    collusive settlement practices."  *Bushansky v. Armacost*, No. 12–CV–01597–JST, 2014 WL

15    2905143, at *1 (N.D. Cal. June 25, 2014).  More specifically, "notice and court approval of

16    settlements under Rule 23.1 discourage private settlements under which the plaintiff-stockholder

17    and his attorney profit to the exclusion of the corporation and nonparty stockholders."  *Papilsky v.*

18    *Berndt*, 466 F.2d 251, 258 (2d Cir. 1972).[3]

19        The Court previously approved the parties' notice plan.  *See In re Lyft, Inc. Derivative*

20    *Litig.*, 2024 WL 4505474, at *6.  Plaintiffs' counsel have since submitted a declaration and several

21    exhibits establishing that they implemented the approved plan.  *See* Dkt. No. 70.  Specifically, as

22    outlined in the Settlement Agreement, (1) Lyft published the Summary Notice in the national

23    edition of *Investor's Business Daily*, (2) Plaintiffs' counsel published the Summary Notice via *PR*

24    *Newswire*; and (3) Lyft posted the Stipulation (and exhibits thereto) and Notice on an internet page

25    that Lyft created and that could be reached through the Lyft website.  Mot. at 15; Dkt. No. 70.  SA

26    § 3.

---

[3] *Papilsky* and other out of circuit cases cited in this order are not precedent but may be considered for their persuasive value.

United States District Court
Northern District of California

The deadline for shareholders to submit objections to the Settlement Agreement and Plaintiffs' request for attorneys' fees was January 13, 2025. Dkt. No. 66. No shareholders filed objections to the proposed settlement or the attorneys' fee request. Mot. at 16. In light of these facts, the Court finds that the parties have sufficiently provided notice to Lyft shareholders and satisfied Rule 23.1(c).

### ii. Fairness, Adequacy, and Reasonableness

The Court analyzed several factors, including (1) benefits to the corporation, (2) possible conflicts or signs of collusion, (3) the scope of release, and (4) preferential treatment, when it granted preliminary approval. *See In re Lyft, Inc. Derivative Litig.*, 2024 WL 4505474, at *4–7. The Court found the Settlement Agreement to be fair, adequate, and reasonable when it granted that approval, and the Court has no reason to alter that determination now that shareholders have received notice and an opportunity to file objections. "[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008). "Courts reviewing settlements of shareholder derivative suits have applied the same presumption." *In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d 508, 518 (N.D. Cal. 2020), *aff'd*, 845 F. App'x 563 (9th Cir. 2021). Accordingly, in the absence of any objections here, "[t]his presumption merely buttresses the Court's prior conclusions regarding the Settlement's fairness." *Id.* Having reviewed the factors set out in Rule 23(e)(2), the Court continues to find that the Settlement Agreement is fair, reasonable, and adequate, and that Lyft shareholders received adequate notice. Accordingly, Plaintiffs' motion for final approval of the shareholder derivative action settlement is GRANTED.

## III. ATTORNEYS' FEES

Plaintiffs' counsel seeks $700,000 in attorneys' fees and expenses from the Individual Defendants' insurers for the 764.05 hours that counsel worked on this matter. Mot. at 24–25.

### A. Legal Standard

"[A] court may grant fees and expenses to derivative counsel when the derivative suit creates a common fund or confers a substantial corporate benefit." *In re Oracle Sec. Litig.*, 852 F.

Supp. at 1445. "The benefit need not be pecuniary to give rise to attorneys' fees." *In re Pinterest Derivative Litig.*, No. C 20-08331-WHA, 2022 WL 2079712, at \*2 (N.D. Cal. June 9, 2022). The Court has discretion to choose either the lodestar method or the percentage-of-the-fund method to calculate reasonable attorneys' fees. *Id.* at \*2. Regardless of method, however, "[t]he appropriate amount of compensation must be based on the benefit that has been conferred to [Lyft] by the derivative suit. The court must thus first determine the total benefit that [Lyft] received from the derivative suit and then determine, from that benefit, a reasonable attorney fee award for derivative counsel." *In re Oracle Sec. Litig.*, 852 F. Supp. at 1446.

### B. Discussion

#### i. Benefits to Lyft

The Court first addresses the degree to which the Settlement Agreement "confers a substantial corporate benefit." *In re Oracle Sec. Litig.*, 852 F. Supp. at 1445. As a preliminary matter, it is important to reiterate that the Settlement Agreement does not provide any monetary compensation to Lyft or its shareholders. Instead, the Settlement Agreement requires Lyft to adopt certain corporate governance reforms and keep those reforms—and other reforms—in place for a three-year period. In attempting to "valu[e] these policy changes for the purpose of determining the total benefit conferred on the corporation," there often "is a serious causation problem in any attempt to attribute the policy changes to the derivative suit." *In re Oracle Sec. Litig.*, 852 F. Supp. at 1446. Here, Lyft had already implemented many of the specified reforms before entering the Settlement Agreement (and in one instance implemented the reform before this lawsuit was even filed). Dkt. No. 60-2[4]; *In re Pinterest Derivative Litig.*, 2022 WL 2079712, at \*3 ("[T]he Court is concerned that this settlement could prove to be mainly cosmetic. No defendant will pay money to the corporation. Instead, certain corporate reforms are to be undertaken but a fair number of the reforms were already in place as a result of the corporation's own actions addressing the problem."). Because the Settlement Agreement fixes these reforms in

---

[4] Lyft implemented the new "Clawback Policy" in October 2023, amended its Code of Business Conduct and Ethics in October 2021, and amended its Compensation Committee Charter and Corporate Governance Guidelines in 2023. Dkt. No. 60-2 at 23–26.

United States District Court
Northern District of California

1    place for a three-year period, the reforms may well engender some lasting trust in Lyft's safety

2    and corporate governance, yielding financial benefits for Lyft.  *See In re Apple Computer, Inc.*

3    *Derivative Litig.*, No. C 06-4128 JF (HRL), 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008)

4    ("At the very least, potential buyers of Apple stock likely will view such reforms as an additional

5    reason to purchase the stock.").

6            In short, here it is difficult to establish the concrete value of the "identifiable benefit that

7    may have been conferred by the derivative action," and "counsel have not provided the Court with

8    a methodology for quantifying the precise benefits that were conferred."  *In re Oracle Sec. Litig.*,

9    852 F. Supp. at 1448; *In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d at 523.

10    The relevant question "is not whether the reforms are valuable, but whether the benefits are

11    quantifiable and clearly attributable to [counsels'] efforts."  *In re Wells Fargo & Co. S'holder*

12    *Derivative Litig.*, 445 F. Supp. 3d at 523.  As set forth above, the precise value of these reforms is

13    difficult to determine.  But having found the settlement fair, adequate, and reasonable, the Court

14    proceeds on the assumption that they have at least some value to the company and its

15    shareholders.

16                    **ii.    The Risks and Burdens Facing Class Counsel**

17            Counsel faced significant risks in this matter, both because "derivative lawsuits are rarely

18    successful" by their nature and because counsel undertook this matter on a contingency fee basis.

19    *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).  *See In re Wells Fargo & Co.*

20    *S'holder Derivative Litig.*, 445 F. Supp. 3d at 523 ("The risk that [counsel] took in litigation on a

21    contingency basis—a risk they have borne for more than three years – also weighs in favor of a

22    substantial attorney's fee award.").  Plaintiffs acknowledge that they faced a "substantial risk that

23    they would have been unsuccessful in defeating Defendants' pre-trial motions."  Mot. at 19.  By

24    Plaintiffs' own admission, they would have faced multiple hurdles in further litigation, including

25    establishing demand futility, overcoming the business judgment rule, and proving damages.  *See*

26    Mot. at 19–20.  Accordingly, the Court finds that this factor weighs in favor of a substantial

27    attorneys' fee award.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### iii.    Comparable Cases

Plaintiffs identify several cases with significant attorneys' fee awards in other governance reform derivative actions. Mot. at 27; *see Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("[I]n most cases it may be . . . appropriate to examine lawyers' reasonable expectations, which are based on the circumstances of the case and the range of fee awards out of common funds of comparable size."). The Court has reviewed these cases but notes that each case appears to involve a settlement agreement that both instituted and maintained multiple governance reforms. While the Settlement Agreement at issue here does implement a few minor reforms, the bulk of the Agreement's benefit is found in its maintenance provisions, which ensure that the reforms will stay in place for at least three years.[5] On this front, the Settlement Agreement is not as substantial as agreements approved in other reform-based derivative actions.

### iv.    Fee Award

In general, district courts have discretion over the amount of attorneys' fees to award. *See Gates v. Deukmejian*, 987 F.2d 1392, 1398 (9th Cir. 1992) ("The district court has a great deal of discretion in determining the reasonableness of the fee . . ."); *Morales v. City of San Rafael*, 96 F.3d 359, 368 (9th Cir. 1996), *opinion amended on denial of reh'g,* 108 F.3d 981 (9th Cir. 1997) ("It is firmly established that the district court has discretion over how much to award for attorney's fees . . .").[6] For several reasons, the Court finds that $700,000 is an unreasonable

---

[5] The Settlement Agreement institutes three reforms: (1) it requires Lyft to post a link to its Compliance and Ethics Hotline on the Lyft website within 90 days of final approval, (2) it adds a new standing member to the Lyft Culture of Ethics and Compliance Committee, and (3) it requires Lyft to make one additional post on its blog regarding in-app safety features available to riders and drivers. Dkt. No. 60-2. The other reforms presented in the Settlement Agreement, including the enhanced Clawback Policy, improved safety feature awareness, amended Code of Business Conduct and Ethics, amended Compensation Committee Charter, and amended Corporate Governance Guidelines, predate the Settlement Agreement. *Id.*

[6] Citing district court cases that are more than ten years old, Plaintiffs suggest that the Court should apply some sort of relaxed scrutiny to the attorneys' fee request because it is unopposed. *See* Mot. at 25. That suggestion is inconsistent with current Ninth Circuit authority establishing that where parties negotiate an attorneys' fees amount as part of a settlement, the district court "has a heightened duty to . . . scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1051 (9th Cir. 2019) (internal citation omitted). The Court has no reason to believe that the Ninth Circuit would apply any different standard in a derivative action.

attorneys' fee award in this matter.

First, there has been relatively little litigation in this case. This action was stayed from February 2021 (two months after it was filed) to January 2024 pending the resolution of the Federal Securities Action. The Federal Securities Action settlement seems to have paved the way for this Settlement Agreement, and this Agreement did not involve monetary negotiations or payments. Second, the Court has reviewed the billing records that counsel submitted and has found numerous examples of unreasonable billing. *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) ("The district court also should exclude from this initial fee calculation hours that were not 'reasonably expended.'"). A partner at one firm, for instance, billed over thirty hours (including nine hours in a single day) for "editing the complaint." At least two other attorneys were also involved in editing the complaint, for multiple hours. And these edits came after an attorney at the same firm spent over thirty-five hours "drafting the complaint." An attorney at one firm billed five hours to "cite check motion for preliminary approval" on the same days that an attorney at another firm billed multiple hours drafting the same document. Another partner billed over thirty hours for work on the "final approval papers," but Plaintiffs' motion for final approval largely resembled their motion for preliminary approval. And attorneys at two firms billed substantial time on drafting these same final approval papers.[7]

The Supreme Court instructs that "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Id.* Here, no such effort is apparent, and the Court is convinced that no paying client would uncritically accept these bills given the apparent instances of excessive billing for overlapping work. Nor do these billing records suggest that counsel exercised "billing judgment." *See Hensley*, 461 U.S. at 434 ("In the private sector, 'billing judgment' is an important component in fee setting . . . . Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* . . . ." (emphasis in original)). The consequence of these issues is that counsel's

---

[7] The Court directs Plaintiffs' counsel to file under seal the exact billing records that were submitted for in camera review via email to HSGpo@cand.uscourts.gov on February 14, 2025, so that they are a part of the record. Counsel must file these materials within seven days of the date of this order.

United States District Court
Northern District of California

1  claimed lodestar, and thus the overall fee amount, is substantially inflated. Accordingly, the Court

2  will apply a downward adjustment of just under 15 percent and award $600,000 in attorneys' fees.

3  *See Gates*, 987 F.2d at 1399 ("[T]he district court has the authority to make across-the-board

4  percentage cuts . . . 'as a practical means of trimming the fat from a fee application'" (internal

5  citation omitted)); *Rosenfeld v. U.S. Dep't of Just.*, 903 F. Supp. 2d 859, 876 (N.D. Cal. 2012)

6  ("Having failed to demonstrate and document in the record that he exercised appropriate billing

7  judgment to eliminate inefficiencies, and coupled with the lack of billing detail contained in

8  certain documents, the Court will adjust Plaintiff's final fee award downward by ten percent to

9  compensate for these shortcomings."). The Court notes that even this reduction is conservative

10  under the circumstances, given the difficulty of cross-comparing the work being done mostly by

11  large teams at two separate firms on often overlapping substantive projects.

12  **IV.    SERVICE AWARD**

13       Plaintiffs ask the Court to award three $1,500 service award payments, which will be

14  drawn from the attorneys' fee award. "Derivative plaintiffs may . . . merit compensation for work

15  done on behalf of the [shareholders]." *In re Wells Fargo & Co. Sharehold Derivative Litig.*, 2019

16  WL 13020734, at *8 (internal citation and quotations omitted). $1,500 is below what some courts

17  have considered "the presumptively reasonable amount of $5,000 for such awards." Accordingly,

18  the Court concludes that the requested service awards are reasonable and grants the awards.

19       //

20       //

21       //

22       //

23       //

24       //

25       //

26       //

27       //

28       //

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**V.    CONCLUSION**

Plaintiffs' motion for final approval of the derivative settlement is granted, Dkt. No. 68. The Court awards attorneys' fees in the amount of $600,000 and litigation costs in the amount of $7,453.67.  The Court approves payment of three $1,500 service awards to the three named plaintiffs.  The parties are directed to implement this Order and the Settlement Agreement in accordance with the terms of the Settlement Agreement.  The Clerk is directed to enter judgment consistent with this order and close the file.

**IT IS SO ORDERED.**

Dated:    3/28/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge

13